**DISTRICT OF COLUMBIA, Appellant,**

v.

**SQUARE 345 ASSOCIATES LTD. PARTNERSHIP, Appellee.**

No. 95–TX–1719.

District of Columbia Court of Appeals.

Argued Jan. 13, 1998.

Decided Feb. 12, 1998.

Lutz Alexander Prager, Assistant Deputy Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

Gilbert Hahn, Jr., with whom Tanja H. Castro, Washington, DC, was on the brief, for appellee.

Before STEADMAN, KING, and REID, Associate Judges.

PER CURIAM:

The District of Columbia appeals the trial court's findings rejecting assessments for tax years 1990, 1991 and 1992 of real property owned by Square 345 Associates Limited Partnership ("the taxpayer"). The court accepted the valuation placed on the property by the taxpayer's expert who relied,

in significant part, upon a process which utilized a "capitalization rate" as characterized by this court in *Rock Creek Plaza–Woodner Ltd. Partnership v. District of Columbia,* 466 A.2d 857 (D.C.1983). For the reasons stated below, we reverse and remand the case to the trial court with instructions to reconsider its valuations in light of our recent decision in *District of Columbia v. Rose Assocs.,* 697 A.2d 1236 (D.C.1997), where we held that the *Rock Creek Plaza* "capitalization rate" characterization was not definitive.

The taxpayer's property is a twelve-story office building located at 1001 G Street, N.W., constructed during the calendar years 1987 to 1989. Assessments of the property were made by the Department of Finance and Revenue ("DFR") for the tax years 1990 (second half only), 1991 and 1992.[1] In each of these years, the building was complete for tax purposes but essentially untenanted. The assessor for the 1990 (second half) and 1991 assessments calculated a property value of $81,759,980 for each of these years, using the "replacement cost" methodology.[2] The assessor for the 1992 assessment calculated a property value of $99,632,000 for that year using the "income capitalization" approach.[3] The taxpayer appealed each of these assessments to the Board of Equalization and Review ("BER"), which affirmed the assessments of the DFR.

The Superior Court, Tax Division, in a consolidated review found for the taxpayer and reduced all three assessments to the significantly lower valuations determined by

1. The valuation date for the 1990 (second half) tax year was December 31, 1989, while the valuation date for the 1991 tax year was January 1, 1990. The tax year 1992 valuation date was January 1, 1991.

2. The cost of the land and the construction of the building itself was approximately $81 million. The developers received a three-year construction loan in that amount.

3. Under D.C.Code § 47–820(a) (1997 Repl.), real property taxes in the District of Columbia are based upon an assessment of the estimated market value of the property as of January 1 of the calendar year preceding the tax assessment year. Regulations adopted by the District of Columbia Council authorize assessors of the DFR to use "when appropriate, one or more of the generally recognized approaches to valuation ... or any other method the Director [of the DFR] deems necessary to arrive at estimated market values." 9 DCMR § 307.2 (1996). The regulations refer specifically to three approaches to valuation: (1) the comparable sales approach (assessed value based "on the price or prices at which reasonably comparable properties have recently sold"); (2) the replacement cost approach (value based "on the cost of replacing property with new property of similar utility at present price level"); and (3) the income capitalization approach (value based on "the amount that investors would be willing to pay to receive the income that the property could be expected to yield"). 9 DCMR §§ 307.3–307.5 (1996).

the taxpayer's expert witness.[4] This expert used the income capitalization approach for the assessments for all three tax years, relying in large part on language in *Rock Creek Plaza.* The court in that case stated that an assessment using the income capitalization approach

> entails deriving a "stabilized annual net income" by reference to the income and expenses of the property over a period of several years. That annual net income is then divided by a capitalization rate—*a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on taxpayers' equity in the property, and to pay real estate taxes.*

*Rock Creek Plaza, supra,* 466 A.2d at 858 (emphasis added). The taxpayer's expert used this characterization as the basis for his calculation of the capitalization rate, which in turn determined the Square 345 property value. That expert selected a capitalization rate that insured payment of the mortgage and real estate taxes and a fair return on the developers's equity in the property, as provided in the italicized material quoted above from *Rock Creek Plaza.*

The trial judge ruled that the general approach and specific calculations of the taxpayer's expert were convincing and concluded that, although the DFR had used the income capitalization approach for the 1992 assessment, it had applied the approach incorrectly. In particular, the court found that the capitalization rate selected by the DFR took into account only "limited" investment adjustments that were "too simplistic to illustrate the expectable income stream" of the building. The judge observed that "[i]f the capitalization rate is insufficient to meet the investment requirements set forth in [*Rock Creek Plaza*], then the assessment or appraisal must [be] rejected by the Court even if it is not otherwise defective."

■ We recently decided in *Rose Assocs.,* however, that the *Rock Creek Plaza* characterization of capitalization rate was not definitive, concluding that the trial court had "misread the *Rock Creek Plaza* language as establishing a binding and all-encompassing definition of 'capitalization rate.'" *Rose Assocs., supra,* 697 A.2d at 1237. The *Rose Assocs.* court observed that the *Rock Creek Plaza* language was "nothing more than oft-repeated dictum, not a binding precedent." *Id.* Because the experts the trial court relied upon in *Rose Assocs.* applied the *Rock Creek Plaza* characterization of the capitalization rate in determining valuation, we reversed and remanded to the trial court for reconsideration in light of what we had held regarding the *Rock Creek Plaza* language. In this case, in rejecting the opinion of the District's expert for the 1992 valuation and in accepting the valuation of the taxpayer's expert for all three years, the trial court also relied upon the *Rock Creek Plaza* characterization.[5] Accordingly, we remand this case with instructions to the trial court to reconsider its

**4.** The taxpayer's expert calculated property values of $52,200,000 for 1990 (second half) and 1991, and $53,900,000 for 1992.

**5.** The trial court also rejected DFR's use of the replacement cost approach for the 1990 (second half) and 1991 assessments, ruling that the income capitalization approach was more appropriate for a largely completed, essentially untenanted building such as the one involved here. The trial judge, relying on language found in *District of Columbia v. Washington Sheraton Corp.,* 499 A.2d 109, 113 n. 5 (D.C.1985) concluded that

> [f]or a new office building, the cost of acquisition also includes an amount of money that the purchaser of a new building is prepared to pay for various expenses during a time when there is no appreciable income in sight. For this reason, the more sophisticated capitalization of

income approach more realistically reveals the worth of the property.... The replacement cost approach simply does not reflect income-related factors that would influence a purchaser ... [and] usually must be rejected where office building properties are concerned....

We do not read *Washington Sheraton,* as the trial judge apparently did, as unequivocally rejecting the replacement cost approach in these circumstances. Indeed, we observed in that case that the "replacement cost approach may be appropriate for newly constructed facilities." *Id.* at 113. We are not saying, however, that the trial court *must* apply the replacement cost method on remand. Rather, the replacement cost method should not be automatically rejected as a possibly valid approach in the valuation of newly constructed commercial property.

valuation for each tax year in light of our decision in *Rose Assocs.*

*Reversed and remanded.*